YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* JOHN L. HARRINGTON.

1. RAILROADS.   *Cattle guards.*   *Code* 1892, § 3561.

  It cannot be judicially declared that the maintenance of a cattle guard of a specified pattern is a compliance with Code 1892, § 3561, making it the duty of railroad companies to maintain proper cattle guards, where their tracks pass through enclosed land, upon proof that the guard is less dangerous to the traveling public than any other kind, but ineffectual to turn cattle.

2. SAME.   *Constitutional law.*   *U. S. Const., XIV. amendment.*

  Code 1892, § 3561, requiring railroads to maintain cattle guards where their tracks pass through enclosed land, is not violative of the fourteenth amendment to the constitution of the United States as depriving the companies of property without due process of law.

FROM the circuit court of, second district, Coahoma county.

HON. SAMUEL C. COOK, Judge.

Harrington, the appellee, was plaintiff, and the railroad company, the appellant, defendant in the court below. From a judgment in plaintiff's favor the defendant appealed to the supreme court.

The suit was to recover damages to crops by the trespassing of stock, which plaintiff charged passed into plaintiff's field over a defective stock gap maintained on defendant's right of way at the point where the railroad entered plaintiff's enclosed lands, and, in addition, for the statutory penalty of $250 under § 3561, Code 1892. The case was tried in the lower court on an

agreed statement of the facts, before the judge, a jury having been waived, and resulted in a judgment for plaintiff for $850.

It was agreed as follows: "That at the points of entrance and exit to plaintiff's inclosed lands by the tracks of defendant's railroad the defendant had put in a Ross surface stock gap and cattle guard, which at the time of the injuries complained of were free from defects of construction and were in good condition and in proper repair; that said Ross stock gap or cattle guard is equal to any other surface cattle guard now in use by railroads, and is up to the highest standard of surface cattle guards used in the operation of railroads; that, over these surface stock gaps or cattle guards, stock, at different times, passed into plaintiff's inclosed land and upon his inclosed lands as described in his declaration, and committed injuries to his crops and lands as sued for; that the defendant and other leading railroads of the country are abandoning the old pit guards and replacing them with the Ross cattle guard, or some other surface guard of equal effectiveness, for the reason that experience in operating railroads has demonstrated that the surface cattle guard in use by defendant, while not as effective in turning stock, insures safety to the lifes and limbs of the traveling public." In connection with the agreed statement of facts, and as part of same, some affidavits were incorporated, given by experts, to the effect that the surface cattle guards are not as effective in turning stock as the pit guard; that the pit guard is being abandoned by leading railroads because it is dangerous to the trains as compared with the surface guards, and has the tendency to imperil the lives of passengers and employes by derailments. It was further agreed that, if the court should decide in favor of plaintiff, judgment was to be rendered for him for $850.

It was stipulated in the agreement that the questions presented for decision were two: (1) Whether or not the Ross surface cattle guard is not a necessary and proper cattle guard, within the true meaning of § 3561, Code 1892. (2) If not a

compliance with that section, whether or not said section is violative of the fourteenth amendment to the constitution of the United States, in that said section deprives the defendant of its property without due process of law—defendant's contention being that under the facts a necessary and proper cattle guard, within the purview of said section, is one that insures the safety of lives and limbs of the traveling public, although the same might not be as effective in turning stock as the pit guard; that to use the pit guard, which is more effective, but more dangerous to the lives and limbs of the traveling public, is not intended by said section, and, if that be true, then the same is a violation of the fourteenth amendment to the constitution of the United States, in that it deprives the defendant of its property without due process of law. Defendant's motion for a new trial was overruled.

*Mayes & Longstreet,* and *C. N. Burch,* for appellant.

The question is sharply presented, whether where there is a conflicting interest like this, where one sort of cattle guard is better for the protection of the adjacent agriculturist from trespass by cattle, and where the other sort of cattle guard is better for the safety of the passengers and employes of the railroad, the railroad company has fulfilled its duty under the statute in preferring and employing the sort of cattle guard which is better for passengers and employes, but not so effective for the farmer.

The court will note that the agreed state of facts is that "the leading railroads of the country are abandoning the use of the old pit guard for the reason that experience in operating railroads has demonstrated that the surface cattle guard . . . insures safety to the lives and limbs of the traveling public."

The court will carefully note the exact language of the statute, which is as follows: "It is the duty of every railroad company to construct and maintain all necessary or proper stock

gaps and cattle guards where its tracks pass through inclosed lands."

It is not vital, but it will be helpful to note that we are here presented with one of the instances in which the word "or," as employed in the statute, is to be read as if it were the word "and." The language of the statute is "necessary or proper stock gaps," meaning "necessary and proper stock gaps." This is obvious, because otherwise the use of the word "proper" is futile and meaningless; for no stock gap could be necessary, in the legal sense, without being at the same time proper.

What the statute means is that the stock gaps shall be necessary as to their location and proper as to their construction. Such has been the practical interpretation placed upon this statute in all of our previous stock gap decisions, in which the question has been treated as to whether a stock gap was or was not properly constructed. 2 Am. & Eng. Ency. Law, 333, title "And."

The error into which the court below fell in applying this statute consisted in treating the same as if the interest of the landowner was alone to be consulted. Such is not the law. *Fort* v. *Chicago, etc., Ry. Co.,* 24 L. R. A., 657, 663; *Railroad Co.* v. *Goset,* 70 Ark., 431; *Railroad Co.* v. *Vosburg* (Ark.), 30 Am. & Eng. R. R. Cas., 1.

The principle above contended for, and fully set forth in the decisions cited, has been fully recognized by this court.

In *Railroad Co.* v. *Spencer,* 72 Miss., 491, speaking of stock gap legislation, this court said: "The purpose of such legislation is not merely to protect the property rights of the owners of cattle injured or killed, but to secure the safety of traveling on railroad cars."

In *Railroad Co.* v. *French,* 75 Miss., 939, the court said on p. 943 as follows: "But we have held that the statute requiring stock gaps and cattle guards to be erected and maintained when necessary and proper was designed not alone for the bene-

fit of the landowner, but for the increased safety of the travel-ing public."

In *Railroad Co.* v. *Anderson,* 76 Miss., 582, the court said, in denying the right of the landowner to have an open lane at the place where he desired a crossing over the railroad track, with stock gaps and cattle guards at the expense of the company: "This would be burdensome to the company, and would, more-over, increase the danger to passengers, employes, and trains by leaving an open space on which live stock might congregate."

This court has fully recognized, therefore, the point for which we contend, which is, that these cattle guard and crossing matters are such that the traveling public are interested in them no less than the landowner.

The railroad company is, therefore, confronted with a pre-dicament unavoidable by it, arising from the necessity of things. Here is one sort of cattle guard which is better for the landowner; here is another sort which is better for the traveling public and the train employes—better because it is safer. Can it be said that the company has disregarded the law which re-quires that the cattle guard shall be "proper" in its construc-tion because it has seen proper to prefer the sort of cattle guard which is greater security to human life to that which gives greater security to crops? This would seem to be a question which should answer itself; but whether so or no, it is already answered judicially in the authorities cited above.

If the code section is so framed, and if it has the effect claimed for it here, that the company is mulcted in damages and subjected to penalties because between two standard styles of stock gaps it prefers the one which conduces to the safety of passengers and employes rather than the one which gives more special protection to the adjacent crops, then that sort of a stat-ute is not "within the legitimate sphere of legislative power."

In the case of *Railroad Co.* v. *Humes,* 115 U. S., 512, the reservation for which we contend is carefully made; and Mr.

Justice Field, after stating the case in his opinion, said: "If the laws enacted by a state be within the legitimate sphere of legislative power and their enforcement be attended with the observance of those general rules which our system of jurisprudence prescribes for the security of private rights, the harshness, injustice, and oppressive character of such laws will not invalidate them as affecting life, liberty, or property without due process of law."

But in the instant case that is just the pinch. We claim that such a law is not "within the legitimate sphere of legislative power."

In *Birmingham Mineral Co.* v. *Parsons,* 27 L. R. A., 263, it was held that a statute which imposes an absolute liability on the railroad company as to all stock passing over or through cattle guards fell short of due process of law, and was unconstitutional.

Here is a clash of interests between mere property rights, on the one hand, and the right of life and of personal security to the traveling public, on the other, and the latter considerations are and must be paramount. No legislature has any right, under any form of American constitutionality, so to disregard them or to prefer mere property interests to them.

Indeed, the whole doctrine of the police power of the state proceeds on a recognition of the underlying principle for which we contend here; for the most common ground on which it is exercised and justified, and justified in cases where property interests of individuals have not merely been subordinated, but have been actually nullified, is the paramount importance of caring for the health of the public, and *a fortiori* of their lives. The whole law of nuisance rests on this principle; so does the right of the establishment of quarantines; so does the right to regulate certain trades and callings, as the trade of a physician or that of a surgeon. Many similar instances will readily occur *to the mind of the court. Mugler* v. *Kansas,* 133 U. S., 623.

*J. W. Cutrer,* for appellee.

Appellee does not agree with the statement of appellant that the word "proper" in the statute refers merely to the construction of the stock gap or cattle guard. The word as there used means, to quote Webster's definition of the word, "suitable in all respects." In other words, the stock gap or cattle guard must be effective.

This controversy when boiled down to its elements is a fight on the part of the railroad company to have the Ross surface cattle guard, by the ruling of this court, established as a legal guard, so that, when sued hereafter by the farmer on account of cattle entering the latter's field over and by way of the cattle guard, it will be sufficient answer to the declaration of the plaintiff to show by the railroad men that the guard in controversy was a "Ross," and that it was put down properly and was in good condition, and that it had by judicial decision been declared to be the thing which the law required. Such a decision would nullify the existing law.

The necessity for cattle gaps was not brought about by the farmer, but by the railroad; and the railroad, and not the farmer, should be compelled to solve the difficulties incident to their use. If it be true that there is no escape from the present difficulty aside from the fencing of the railroad's right of way, then the railroad, and not the farmer, should do it. And if it be argued that this course would entail an enormous expense upon the railroad, the sufficient answer is that the railroad, and not the farmer, brought about the necessity. Code 1892, § 3561, is constitutional.

Such legislation is undeniably an exercise of the police power, and when once it has been established that certain legislative regulations are legitimate exercises of the police power of the state, the court will not interfere with the enforcement of such laws on the ground that they are harsh and unjust. Those questions lie in the discretion of the legislature, just so long as the regulations bear equally on all persons or

corporations upon whom they are imposed. *Mugler* v. *Kansas,* 123 U. S. (31 L. ed.), 235; *Barbier* v. *Connelly,* 113 U. S. (28 L. ed.), 923, and note; note to *State* v. *Goodwill,* 28 Am. St. Rep., 863, 882.

To use the language of Mr. Justice Field, in *Railroad* v. *Humes,* 115 U. S., 512, 520: "It is hardly necessary to say that the hardship, impolicy, and injustice of state laws is not necessarily an objection to their constitutional validity, and that the remedy for evils of that character is to be sought from state legislatures." And, as observed by Mr. Justice Miller, in *Davidson* v. *New Orleans,* 96 U. S., 97, 104, the fourteenth amendment cannot be availed of "as a means of bringing to the test of a decision of this court the abstract opinion of every unsuccessful litigant in the state court of the justice of the decision against him, and of the merits of the legislation on which such a decision may be founded."

WHITFIELD, C. J., delivered the opinion of the court.

The primary object of § 3561, Code 1892, is to protect the farmers of this state from the depredations of cattle entering over the railroad right of way, and this primary object must be the polestar of construction in determining its purpose. We have held, and again reaffirm the doctrine, that the object of the section was not only to protect farmers' crops, but to secure the safety of the traveling public. Because, in this particular instance, the Ross cattle guard is perfect of its kind, this court is not to decree its use a perfect defense to suits for damages by trespassing stock. The kind may not be reasonably effective to keep out stock—not a perfect kind of cattle guard. The argument is that, though this surface cattle guard is ineffective to keep out stock, yet, because it is less dangerous to the traveling public than the pit cattle guard, this Ross cattle guard, if perfectly constructed, must be judicially declared a compliance with § 3561, Code 1892, whose fundamental purpose is the safety of crops. This is an easily demonstrable

fallacy. Pursue the contention to its logical result, and what do we have as the conclusion? Why, that since the Ross and other surface cattle guards, though ineffective to shut out cattle, better conserve the safety of the traveling public than the pit guard, therefore no cattle guard at all is best, since none at all least interferes with the safety of the traveling public. Or, to put it in syllogistic form: Major premise: The safety of the traveling public is the supreme concern. Minor premise: The Ross surface cattle guard, if ineffective against cattle, best secures the safety of the traveling public. Conclusion: Therefore, a Ross cattle guard complies with sec. 3561. Or, *ergo,* a cattle guard which secures the safety of the traveling public in the highest degree is the proper one under sec. 3561, even though the least effective against cattle, or not effective at all. From which it is an easy step to the conclusion that a plain track, uninterfered with at all, is the best cattle guard of all. This no one can fail to see would be a direct nullification of the primary object of the section, and is, of course, wholly inadmissible. On the contrary, it would be equally absurd to hold that a cattle guard which was perfect against cattle is a proper one, although it constantly resulted in loss of life by derailment of trains. Not here, more than anywhere else, is the solution of vexed questions to be found by running out opposite theories to extreme conclusions. We must administer the law as a practical science coming home to the "business and bosoms of men," not as a set of speculative theories intended for the exercise of a discursive fancy. The proper cattle guard must consult the safety of the traveling public, certainly; and just as certainly must it keep out stock. The proper cattle guard requires that it be so constructed as best to combine these objects; so as, whilst being reasonably effective against stock, it shall also be reasonably preservative of the safety of the traveling public.

As to the second branch of the argument, it is enough to say that sec. 3561 is a legitimate exercise of the police power of the state, and hence the fourteenth amendment to the constitution

of the United States is not involved.　This is settled by many decisions of the United States supreme court admirably grouped by appellee's counsel, among which we specially refer to *Mugler* v. *Kansas,* 123 U. S., 623 (8 Sup. Ct., 273; 31 L. ed., 205); *N. Y. & N. E. R. R. Co.* v. *Bristol,* 151 U. S., 571 (14 Sup. Ct., 437; 38 L. ed., 269); *Davidson* v. *N. O.,* 96 U. S., 104 (24 L. ed., 616); *R. R. Co.* v. *Humes,* 115 U. S., 520 (6 Sup. Ct., 110; 29 L. ed., 463); *Lake Shore & M. S. R. Co.* 1. Ohio, 173 U. S., 285 (19 Sup. Ct., 465; 43 L. ed., 702).

The public convenience, as well as the public safety, health, and morals, is within the sweep of the police power.　That power is to organized government what the atmosphere is to man—"its vital breath, its native air."　It penetrates, permeates, pervades all, in its omnifically healing reach—"broad and general as the casing air."　It is the oil in which the machinery of government efficiently moves.

*Affirmed.*